IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| Amy Pizzimenti, | Case No. 3:08 CV 2175 |
| Plaintiff, | MEMORANDUM OPINION AND ORDER |
| -vs- | JUDGE JACK ZOUHARY |
| Oldcastle Glass Incorporated, et al., | |
| Defendants. | |

## INTRODUCTION

This matter is before the Court on a Motion for Summary Judgment by Defendant Oldcastle Glass, Inc. on all claims brought by Plaintiff Amy Pizzimenti (Doc. No. 68). The Motion asks the Court to grant summary judgment on the following claims: (1) Ohio Revised Code 4112.02 pregnancy discrimination; (2) intentional infliction of emotional distress; (3) a public policy tort claim; and (4) a separate and distinct claim solely for punitive damages. For the reasons set forth below, the Motion is denied as to the pregnancy discrimination claim, and granted on all other claims.

## FACTUAL AND PROCEDURAL BACKGROUND

In April 2007, Defendant Oldcastle Glass, Inc. (Oldcastle) concluded its search for a business analyst for its Maumee, Ohio IT facility by hiring Plaintiff Amy Pizzimenti (Pizzimenti). Plaintiff learned from her doctor on April 25, 2007, subsequent to accepting Oldcastle's employment offer, that she was three weeks pregnant. Plaintiff began working for Oldcastle on May 7, 2007.

The next day, May 8, Plaintiff attended a previously scheduled doctor's appointment for her initial ultrasound. At that appointment, Plaintiff's physician gave her an estimated due date of January 1, 2008. Plaintiff testified that her physician did not place any restrictions of any nature on what he termed a "normal pregnancy" (Doc. No. 66 at 33).

When Plaintiff returned to work, she met with Eric Arntsen, Training Manager for the IT group, to review some software (Doc. No. 66 at 234). Following the presentation, Arntsen began reviewing the implementation plan for a software project at a facility in Texas. At this point, Plaintiff asked Arntsen if there was a time line for the project (Doc. No. 66 at 18). He responded that he wanted the project finished by the end of the year, but the time line would be left up to her (Doc. No. 66 at 31). Plaintiff then asked if she could complete the project by Thanksgiving (Doc. No. 66 at 19). Arntsen responded that would be "excellent" (Doc. No. 66 at 19). Plaintiff then disclosed to Arntsen that she was pregnant (Doc. No. 66 at 31). Shortly after this disclosure, Arntsen ended the session and went to the office of Defendant Scott Helle, Manager of the IT group, to inform him of Plaintiff's pregnancy (Doc. No. 63 at 39).

Plaintiff went to lunch with Arntsen, Helle, and other co-workers, as she had the previous day. In stark contrast to the previous lunch, when she was included in the conversation, she described this lunch as "uncomfortable" with no one talking to her (Doc. No. 66 at 239).

Following lunch, Arntsen and Helle met to discuss the impact of Plaintiff's pregnancy. Helle had immediate concerns about Plaintiff's pregnancy, based on his assumption that a pregnant woman would have difficulty traveling (Doc. No. 63 at 43). Arntsen never told Helle, nor did Helle ask about, Plaintiff's anticipated due date, or any restrictions on the pregnancy (Doc. No. 63 at 39-40).

2

Therefore, Helle's concern did not appear to be based on the conflict between Plaintiff's due date and the "go-live" date in Texas, as he did not know when Plaintiff's due date was at that point.

Without asking Plaintiff if she had been given any travel restrictions by her physician, Helle promptly initiated the first of two telephone conferences between himself, Arntsen, and Mollie Hines, Vice President of Human Resources, to discuss his concerns about Plaintiff's pregnancy (Doc. No. 63 at 39-40). The first call took place the afternoon of May 8, 2007 (the date Plaintiff informed Arntsen of her pregnancy), with a second call the morning of May 9, 2007 -- both before any meeting with Plaintiff (Doc. No. 75 at 25, 32-33).

Helle conveyed to Hines in those two telephone calls that he did not know if Plaintiff could handle the project given her "current set of circumstances" (Doc. No. 75 at 27). Hines told Helle and Arntsen that they should find out from Plaintiff whether she could meet the job requirements. Helle never asked Hines what his options were if Plaintiff said she could perform the job requirements (Doc. No. 63 at 83). Helle "didn't see a way" that it was possible for Plaintiff to fulfill the needs of the job (Doc. No. 63 at 84). The topic of Plaintiff's resignation was discussed during these telephone meetings (Doc. No. 75 at 38).

Following the telephone calls, Helle directed Arntsen and Sylvia Dapkus, the Development Manager, to meet with Plaintiff to discuss whether she could perform the requirements of the job (Doc. No 65 at 100). On the morning the meeting was to take place, May 9, Helle contacted another Oldcastle location in Perrysburg, Ohio, to investigate whether there was another position for Plaintiff (Doc. No. 63 at 76). After this inquiry, Arntsen and Dapkus escorted Plaintiff into Helle's office, while Helle waited in another part of the building (Doc. No. 64 at 133). Arntsen shut the door and

3

sat on one side of Plaintiff while Dapkus sat on her other side, flanking Plaintiff with two managers. The meeting lasted some forty minutes (Doc. No. 66 at 107).

Arntsen began the meeting by reiterating the job requirements as including extensive travel -- three to four weeks a month. For the first time, Arntsen instructed Plaintiff that she would be working long days of twelve to fourteen hours on her feet, an issue that had never previously been raised (Doc. No. 66 at 75). Plaintiff responded by affirming she could meet the job requirements (Doc. No. 66 at 74; Doc. No. 65 at 104). Arntsen then pivoted the questioning to the necessity of Plaintiff being present in Texas on January 1, 2008. Plaintiff testified that this was the first time she was ever advised of any requirement to be in Texas on January 1, 2008 (Doc. No. 66 at 78). Communications made to Plaintiff regarding the job requirements support this testimony (Doc. Nos. 72-2, 72-3, 72-4).

Plaintiff and Defendants dispute what happened next in the meeting. Defendants argue Plaintiff admitted she would not be able to meet the job requirements after she was questioned "for detail," and that she then offered her resignation (Doc. No. 68-2 at 10). Plaintiff argues she became panic-stricken and distressed by the situation and felt compelled to quit, and that Arntsen repeated the following statement frequently throughout the meeting: "when deadlines are not met people are terminated," defining "deadlines" as including "doctor appointments" and "when people are late" (Doc. No. 66 at 90-91, 95). Plaintiff argues this referred to her doctor's appointment of the previous day, and that she had "no other option" but to quit (Doc. No. 66 at 105).

Upon Plaintiff's resignation, the meeting was adjourned and Plaintiff returned to her office. Arntsen immediately reported to Helle (Doc. No. 63 at 72) that Plaintiff could not meet the heavy travel demands of the job, particularly at the end of the year, and that Plaintiff had offered her resignation (Doc. No. 63 at 48). Helle did not obtain any further specifics from Arntsen and accepted

4

his assertion that Plaintiff had voluntarily quit (Doc. No. 63 at 87). Helle then called Hines and reported Plaintiff's resignation.

Arntsen retrieved a resignation letter prepared by Helle (Doc. No. 63 at 58). Arntsen and Dapkus went to Plaintiff's office where Arntsen put the letter in front of Plaintiff and asked her to sign it, with Dapkus waiting by the door (Doc. No. 66 at 108). Plaintiff signed and then was escorted off the premise. She received three week's severance (Doc. No. 66 at 95).

Following her termination, Plaintiff had a normal pregnancy without any restrictions, and gave birth to a baby boy on December 18, 2007 (Doc. No. 66 at 37). The "go-live" date for the project in Texas never took place. In May 2007, the same month Plaintiff was terminated, Oldcastle acquired another facility which had its own IT department, so the vacancy left by Plaintiff was never filled (Doc. No. 73 at 36).

Plaintiff filed her initial Complaint in this case in the Eastern District of Michigan (Doc. No. 1). The individual Defendants (Arntsen, Dapkus, and Helle) were dismissed without prejudice for lack of *in personam* jurisdiction and the case was transferred to this Court with only Oldcastle as a Defendant (Doc. No. 34). Plaintiff later amended her Complaint to include the three individual Defendants again (Doc. No. 53). As part of a Stipulated Order that waived any objection to service of process on the Amended Complaint, both parties agreed to dismiss all claims against Defendant Dapkus with prejudice, and to consider the Motion for Summary Judgment to be on behalf of the remaining Defendants Oldcastle, Arntsen, and Helle (Doc. No. 78).

### SUMMARY JUDGMENT STANDARD

Pursuant to Federal Civil Rule 56(c), summary judgment is appropriate where there is "no genuine issue as to any material fact" and "the moving party is entitled to judgment as a matter of

5

law." *Id*. When considering a motion for summary judgment, a court must draw all inferences from the record in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). A court is not permitted to weigh the evidence or determine the truth of any matter in dispute; rather, a court determines only whether the case contains sufficient evidence from which a jury could reasonably find for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986).

## DISCUSSION

### Pregnancy Discrimination

Because there exist genuine issues of material fact, the Court denies this part of Defendants' Motion for Summary Judgment.

Plaintiff filed her pregnancy discrimination claim under Revised Code 4112.02(A) which makes it unlawful for any employer to discriminate because of sex.[1] Both parties agree that federal case law interpreting the Pregnancy Discrimination Act (PDA), 42 U.S.C. 2000e(k), the federal equivalent to a Revised Code 4112.02 pregnancy discrimination action, is applicable to this case. *Kocak v. Community Health Partners of Ohio*, *Inc.*, 400 F.3d 466, 471-72 (6th Cir. 2005) (quoting *Plumbers & Steamfitters Joint Apprenticeship Comm'n v. Ohio Civil Rights Comm'n*, 66 Ohio St. 2d 192, 196 (1981)).

---

[1] Revised Code 4112.01(B) further explains that:

> . . . 'because of sex' and 'on the basis of sex' include, but are not limited to, because of or on the basis of pregnancy, any illness arising out of and occurring during the course of a pregnancy, childbirth, or related medical conditions. Women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes, including receipt of benefits under fringe benefit programs, as other persons not so affected but similar in their ability or inability to work, and nothing in division (B) of section 4111.17 of the Revised Code shall be interpreted to permit otherwise.

The requirements of Revised Code 4112.01-02 coincide with the federal PDA which provides that pregnant employees "shall be treated the same for all employment-related purposes . . . as other persons not so affected but similar in their ability or inability to work." The history of the PDA confirms that its standard was "chosen to protect female employees from being treated differently from other employees simply because of their capacity to bear children." *International Union, UAW v. Johnson Controls, Inc.*, 499 U.S. 187, 205 (1991).

To prevail on a pregnancy discrimination claim, a plaintiff must either produce direct evidence of intentional discrimination, or use the familiar *McDonnell Douglas* burden-shifting approach. *Risch v. Royal Oak Police Dep't*, --- F.3d ----, 2009 WL 3011656, \*6 (6th Cir. 2009). Under the *McDonnell Douglas* approach, once a plaintiff establishes a prima facie case for pregnancy discrimination, the defendant must then offer a legitimate non-discriminatory reason for the defendant's actions. If a defendant offers a legitimate non-discriminatory motive, the burden then shifts back to the plaintiff to show the proffered explanation was pretextual. "On a motion for summary judgment, a District Court considers whether there is sufficient evidence to create a genuine dispute at each stage of the *McDonnell Douglas* inquiry." *Blair v. Henry Filters, Inc.*, 505 F.3d 517, 524 (6th Cir. 2007) (quoting *Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 661 (6th Cir. 2000)). Plaintiff has not presented adequate evidence for a direct evidence approach, but does make a plausible indirect case.

The Direct Case

Plaintiff has not presented evidence directly showing intentional discrimination. Direct evidence is "that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Jacklyn v. Schering-Plough Healthcare Prod.*

7

*Sales Corp.*, 176 F.3d 921, 926 (1999). Plaintiff points to one statement made by Helle (Doc. No. 63 at 100):

> Q: Are you aware of any other limitation on her ability to perform the job other than her pregnancy?
> A: No

Plaintiff argues this is direct evidence of discriminatory animus. However, given the context of this case, this single statement is not such evidence. *See Weigel v. Baptist Hosp. of East Tenn.*, 302 F.3d 367, 382 (6th Cir. 2002) ("It is well established that isolated and ambiguous comments are not sufficient to make out a direct evidence case of employment discrimination."). The statement is consistent with Defendants' proffered legitimate non-discriminatory rationale that Plaintiff voluntarily resigned when she realized her pregnancy would not allow her to meet the job requirements.

### The Indirect Case

A prima facie showing of pregnancy discrimination must affirmatively answer the following four questions:

1. Was the plaintiff pregnant?
2. Was the plaintiff qualified for the employment at issue?
3. Was there an adverse employment decision?
4. Was there a nexus between the plaintiff's pregnancy and the adverse employment decision?

*Cline*, 206 F.3d at 658. The prima facie requirement "is not onerous." *Cline*, 206 F.3d at 660 (quoting *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 253 (1981)). This first phase exists to "raise a rebuttable presumption of discrimination by 'eliminat[ing] the most common nondiscriminatory reasons for the [employer's treatment of the plaintiff].'" *Hollins v. Atlantic Co.*, 188 F.3d 652, 659 (6th Cir. 1999) (quoting *Burdine*, 450 U.S. at 253-54). The prima facie phase "is

not meant to stymie plaintiffs, but simply serves to 'bring the litigants and the court expeditiously and fairly to the ultimate question.'" *Cline*, 206 F.3d at 660 (quoting *Burdine*, 450 U.S. at 253).

Here, there is no dispute on the first element -- both parties agree Plaintiff was pregnant at the time of her resignation. Therefore, Plaintiff has met the first element of a prima facie case.

Plaintiff has also met her burden on the second element of a prima facie case. The dispute here on the "qualified" element of the prima facie case is similar to the arguments in *Cline*. In *Cline*, the defendant argued the plaintiff was fired because, by virtue of her pregnancy, she was not qualified for her job. *Cline*, 206 F.3d at 660. The court of appeals overturned the district court's holding that Cline had not met her burden on the qualification element, noting that the district court's "analysis improperly imported the later stages of the *McDonnell Douglas* inquiry into the initial prima facie stage." *Id.* Instead, the *Cline* court held:

> rather than resolve this debate at the prima facie stage, *McDonnell Douglas* requires that the district court consider this dispute at the inquiry's third stage, when its role is to decide the 'ultimate question' of discrimination. In other words, when assessing whether a plaintiff has met her employer's legitimate expectations at the prima facie stage of a termination case, a court must examine plaintiff's evidence independent of the nondiscriminatory reason 'produced' by the defense as its reason for terminating plaintiff.

*Id.* at 660-61.

Defendants argue the instant case is dissimilar to *Cline* because Plaintiff "by her own admission acknowledges that she was unable to commit that she could meet essential requirements of the job, and so resigned when offered severance pay" (Doc. No. 76 at 8). However, Plaintiff alleges she only made this admission when pressured by her supervisor to sign a resignation letter. Plaintiff was targeted for the position she accepted with Oldcastle by a headhunter who described her to Oldcastle as "the complete package" (Doc. No. 74 at 78). Plaintiff was then hired by Oldcastle,

9

and Defendants offer no evidence of her being unqualified for the job outside of their argument regarding their legitimate non-discriminatory reason discussed below.  (Given that Plaintiff only worked for Oldcastle for less than a week before her resignation, there is not much evidence about Plaintiff's qualifications apart from the decision to hire her.)  Plaintiff has therefore satisfied the "qualification" prong of the prima facie case.

On the third element of the prima facie case -- adverse employment decision -- Plaintiff argues a theory of constructive discharge, whereas Defendants claim that her resignation was made freely of her own volition, without any coercion by Defendants.  There is a genuine issue of material fact regarding whether Plaintiff freely resigned, or was pressured into resignation by Defendants.

A constructive discharge occurs "if working conditions are such that a reasonable person in the plaintiff's shoes would feel compelled to resign." *Scott v. Goodyear Tire & Rubber Co.*, 160 F.3d 1121, 1128 (6th Cir. 1998).

Arntsen and Dapkus, two superiors of Plaintiff, held a meeting with Plaintiff in the office of Helle, the Manager of the group, where, allegedly, Defendants made repeated assertions that people who miss deadlines, or are late due to doctor's appointments, are terminated.  Plaintiff had just come in late from an approved doctor's appointment.  Plaintiff's resignation was also clearly contemplated by Helle prior to the meeting, as he allegedly drafted the resignation letter which Arntsen later presented to Plaintiff to sign.  Plaintiff resigned only two days after beginning her job at Oldcastle, after quitting her previous job -- indicating she was making a serious commitment to Oldcastle.  (Plaintiff's husband also left his employment when Plaintiff took the Oldcastle position.)

A court's role in ruling on a motion for summary judgment in a case like this is to determine whether there is "sufficient evidence to create a genuine dispute at each stage of the *McDonnell*

10

*Douglas* inquiry." *Blair v. Henry Filters, Inc.*, 505 F.3d 517, 524 (6th Cir. 2007) (quoting *Cline*, 206 F.3d at 661). The above facts constitute sufficient evidence to create a genuine dispute regarding whether a reasonable person in Plaintiff's position would feel compelled to resign. Plaintiff has met the third prong of her prima facie case.

The fourth and last element of the prima facie case is whether there was a nexus between the adverse employment decision and the pregnancy. Assuming there was a constructive discharge, there certainly was a nexus between it and Plaintiff's pregnancy.

"Temporal proximity can establish a causal connection between the protected activity and the unlawful employment action." *Asmo v. Keane*, 471 F.3d 588, 593 (6th Cir. 2006). The "temporal proximity" found sufficient for a nexus in *Asmo* was two months. *Id.* at 594. Here, Plaintiff informed Arntsen of her pregnancy *the day before* the alleged constructive discharge. Also, the meeting where Plaintiff tendered her resignation indisputably was held for the purpose of addressing Plaintiff's pregnancy and its implications on her job. Plaintiff meets the nexus requirement, along with the first three prongs of her prima facie case, and has therefore shifted the burden to Defendants to provide a legitimate non-discriminatory basis for their actions.

<u>Legitimate Non-Discriminatory Rationale</u>

As Plaintiff has met her burden by providing sufficient evidence to make out a prima facie case, the burden now shifts to Defendants to provide a legitimate non-discriminatory rationale. *Risch*, 2009 WL 3011656 at *6. "The burden that shifts to the defendant . . . is to rebut the presumption of discrimination by producing evidence that the plaintiff was rejected, or someone else was preferred, for a legitimate, nondiscriminatory reason. The defendant need not persuade the court that it was actually motivated by the proffered reasons." *Burdine*, 450 U.S. 248 at 254.

11

Defendants' proffered legitimate non-discriminatory rationale hearkens back to the dispute over Plaintiff's employment qualifications. Defendants argue Plaintiff's pregnancy prevented her from meeting requirements essential to her position. Specifically, Plaintiff would not be able to travel as required, and her due date conflicted with a "go-live" date for which she would have to travel to Texas. Having offered a legitimate non-discriminatory rationale, Defendants have shifted the burden to Plaintiff to prove pretext. As discussed below, the Court finds a genuine issue of material fact whether this rationale was a pretext for a discriminatory motive.

Pretext

Once a defendant has offered a legitimate non-discriminatory rationale for its actions, the burden shifts again to the plaintiff to demonstrate the rationale to be a mere pretext. The plaintiff's task is to "identify evidence from which a reasonable jury could conclude that the proffered reason is actually a pretext for unlawful discrimination." *Blair*, 505 F.3d at 524 (quoting *Cline*, 206 F.3d at 661).

Plaintiff's argument addresses the "go-live" date of January 1, 2008. It is Plaintiff's position that this date was never communicated to her until the meeting where she offered her resignation. Plaintiff asserts she was told that Oldcastle wanted the job to be done by year end and that it was acceptable if finished around Thanksgiving. Defendants argue the go-live date, and being present in Texas for it, was an essential requirement of Plaintiff's employment. The parties' positions are inconsistent, and the Court finds this to be a genuine issue of material fact precluding summary judgment on the pregnancy discrimination claim.

Plaintiff points to the case of *Maldonado v. U.S. Bank*, 186 F.3d 759 (7th Cir. 1999), as being directly on point with Plaintiff's situation here. The bank in *Maldonado* fired Maldonado because

12

"her pregnancy would make her unavailable during the summer months" when she was needed to cover for other employees' vacations. *Id.* at 766. There was no evidence that Maldonado "had an attendance problem; the bank simply assumed that, because of her pregnancy, [she] would be absent from work for an indeterminate period sometime in the future." *Id.* The court held that an employer "cannot take anticipatory action unless it has a good faith basis, supported by sufficiently strong evidence, that the normal inconveniences of an employee's pregnancy will require special treatment." *Id.* at 767.

Viewing the facts in a light most favorable to Plaintiff, the Court concludes here, as in *Maldonado,* that a reasonable jury could find that Defendants lacked a "good faith basis, supported by sufficiently strong evidence" for the adverse employment decision. Helle testified there was no limitation on Plaintiff's job other than her pregnancy (Doc. No. 63 at 100), and he contemplated her resignation in his discussion with Hines without knowledge of Plaintiff's due date. Helle was contemplating Plaintiff's resignation and inability to perform her job prior to any discussion he had with her on the matter. The decision-makers at the Oldcastle IT group made the same unwarranted assumption as the employer in *Maldonado.*

**Intentional Infliction of Emotional Distress**

Defendants also move for summary judgment on Plaintiff's intentional infliction of emotional distress claim. For the reasons below, the Court grants summary judgment in favor of Defendants on this claim.

To establish a claim for intentional infliction of emotional distress, a plaintiff must prove, *inter alia*, that the defendant's conduct was "so extreme and outrageous" as to go "beyond all possible bounds of decency" and was such that it can be considered "utterly intolerable in a civilized

community," and that as a consequence of that conduct the plaintiff suffered severe and debilitating mental anguish. *Yeager v. Local Union 20*, 6 Ohio St. 3d 369, 374-75 (1983); *Ashcroft v. Mount Sinai Medical Center*, 68 Ohio App.3d 359, 366 (1990). Here, Plaintiff fails both the "outrageousness" and severe mental anguish elements.

The "outrageousness" determination is a question of law for the court to decide. *Crawford v. ITT Consumer Fin. Corp.*, 653 F.Supp. 1184, 1192 (S.D. Ohio 1986). Plaintiff's allegations of improper conduct fall short of the extreme and outrageous conduct necessary for the tort of intentional infliction of emotional distress. Courts have found conduct far more "extreme" than the alleged conduct in the instant case to not meet the "outrageousness" standard. *See, e.g.*, *Boggs v. Avon Prods., Inc.*, 56 Ohio App.3d 67, 73-74 (1990) (allegations that plaintiff's supervisor continually harassed and threatened him after he suffered an accident, knowing that such conduct would cause him anxiety, did not rise to level of "atrocious," "utterly intolerable," or "outrageous").

Additionally, Plaintiff fails to meet the severe mental anguish element for the tort of intentional infliction of emotional distress. The Court cannot find anything in the record other than a conclusory statement in the Amended Complaint (Doc. No. 53 at 5) and one sentence in Plaintiff's Opposition alleging "significant stress" (Doc. No. 72 at 28) to support a finding of severe mental anguish. While Plaintiff suffered some stress due to the loss of her job, intentional infliction of emotional distress requires that a plaintiff suffer serious mental anguish "of a nature that 'no reasonable man could be expected to bear it.'" *Ashcroft*, 68 Ohio App.3d at 366 (quoting Restatement of Torts 2d, section 46, comment j). Plaintiff here does not point to such anguish anywhere in her opposition.

**Public Policy Claim**

Plaintiff raises a common law tort claim for a public policy violation in Count III of the Amended Complaint. In order to prevail on this claim, a plaintiff must prove the following four elements:

1. *The clarity element*: a clear public policy exists and is manifested in a state or federal constitution, statute, or administrative regulation, or in the common law.
2. *The jeopardy element*: dismissing employees under circumstances like those involved in the plaintiff's dismissal would jeopardize the public policy.
3. *The causation element*: the dismissal was motivated by conduct related to the public policy.
4. *The overriding justification element*: the employer lacked overriding legitimate business justification for the dismissal.

*Collins v. Rizkana*, 73 Ohio St. 3d 65, 69-70 (1995) (adopting the above elements).

Ohio law does not support Plaintiff's claim because the public policy at issue is already protected by an available and adequate remedy found in Revised Code 4112, and the jeopardy element therefore cannot be met. *Leininger v. Pioneer Nat'l Latex*, 115 Ohio St. 3d 311, 317 (2007) ("[I]t is unneccessary to recognize a common-law claim when remedy provisions are an essential part of the statutes upon which the plaintiff depends for the public policy claim and when those remedies adequately protect society's interest by discouraging the wrongful conduct."); *Wiles v. Medina Auto Parts*, 96 Ohio St. 3d 240, 244 (2002) ("Simply put, there is no need to recognize a common-law action for wrongful discharge if there already exists a statutory remedy that adequately protects society's interests . . . In that situation, the public policy expressed in the statute would not be jeopardized by the absence of a common-law wrongful-discharge action in tort because an aggrieved employee has an alternate means of vindicating his or her statutory rights and thereby discouraging an employer from engaging in the unlawful conduct."). The weight of authority is clearly against

allowing public policy claims based on Revised Code 4112.02. *See e.g.*, *Carrasco v. NOAMTC Inc.*, 124 F. App'x 297, 304 (6th Cir. 2004) (upholding a district court's dismissal of a public policy claim based on Revised Code 4112.02).

Plaintiff argues that the pregnancy discrimination claim arising under Revised Code 4112.02 "does not necessarily provide remedies broad enough to fully compensate plaintiff" (Doc. No. 72 at 26). This Court disagrees. As discussed below, Ohio law allows the full range of remedies in civil actions alleging violations of Revised Code 4112.02. *See Rice v. CertainTeed Corp.*, 84 Ohio St. 3d 417 (1999); R.C. 4112.99.

For the foregoing reasons, the Court grants Defendant's Motion for Summary Judgment on the public policy claim found in Count III of Plaintiff's Amended Complaint.

## Separate Punitive Damages Claim

An individual and separate claim for punitive damages is not allowed under Ohio law. *Moskovitz v. Mt. Sinai Med. Ctr.*, 69 Ohio St. 3d 638, 649 (1994). "Punitive damages are awarded as punishment for causing compensable harm and as a deterrent against similar action in the future. No civil cause of action in this state may be maintained simply for punitive damages." *Bishop v. Grdina*, 20 Ohio St. 3d 26, 28 (1985) (superceded by rule on other grounds). Punitive damages are awarded as an "incident of the cause of action for which they are sought." *Moskovitz*, 69 Ohio St. 3d at 649. Therefore, the Court grants Defendant's Motion for Summary Judgment on the separate and distinct claim for punitive damages found in Count IV of Plaintiff's amended complaint.

Whether Plaintiff is entitled to punitive damages on her pregnancy discrimination claim is a separate question. Plaintiff includes a plea for punitive damages in her Amended Complaint under the pregnancy discrimination claim (Doc. No. 53 at 39). Punitive damages are available on Revised

Code 4112.99 claims upon evidence of actual malice. *Rice v. CertainTeed Corp.*, 84 Ohio St. 3d 417, 422 (1999). Here, Plaintiff's sole claim surviving summary judgment is her pregnancy discrimination claim arising under Revised Code 4112.02 and 4112.99. Neither party briefed this issue; it remains open for trial limited to this claim.

## CONCLUSION

The Motion for Summary Judgment is granted with respect to the counts for intentional infliction of emotional distress, public policy, and punitive damages; and is denied with respect to the count for pregnancy discrimination.

IT IS SO ORDERED.

    s/ *Jack Zouhary*
JACK ZOUHARY
U. S. DISTRICT JUDGE

October 27, 2009